May it please the court, Joseph Daly for the lead plaintiff's appellant. I'm going to reserve three minutes for rebuttal. I'll keep an eye on my time. This morning, your honors, I'm going to be focusing on the main theme that was running through the district court's dismissal opinion, and that is that the adverse reports reaching Maatrixx about the link between its Zycam cold medicine and some users' loss of sense of smell, anosmia, nonetheless didn't rise to, quote, a statistically significant level, and therefore, as a matter of law, were immaterial, meaning otherwise that the defendants couldn't have made any fraudulent misstatements or omissions of material facts. Now, the district court committed several errors here. The first obvious error is that the district court erred in erecting a bright line test of materiality. That bright line contradicts Supreme Court authority and this Court's authority. It contradicts the Supreme Court case of Basic v. Levinson. It contradicts the Supreme Court case of TSC Northway. And it contradicts this Court's recent decision in America West. Now, we know that the materiality of the info that is coming into the Maatrixx Corporation is looked at objectively. It is looked at objectively through the eyes of a reasonable investor. Would Maatrixx investors have wanted to know that at least 23 users of this cold medicine were complaining of having lost their sense of smell immediately after using the medicine? I think they would have, especially because Maatrixx had warned their own investors. What facts were alleged in your complaint which stated that the managers of Maatrixx knew that these 23 complaints would be material to buyers of their shares? Well, two responses to that, Judge Beyer. You have to have a strong inference of scienter, right, under PSLRA? Of course. I agree. Of course. Two answers to that. Number one, I think Your Honor, again, is putting the focus on what the managers at Maatrixx thought about the information coming in. And because this is a securities fraud class action, the question is what would have reasonable investors have wanted to know? Would they have wanted to know about these facts? This is a scienter case. You have to prove that they made a false statement or omitted a material statement. With knowledge. Why was the statement material, the 23 claims, why was that material to the issuers, buyers? Well, one very quick short answer to that, and there's much more to my answer, but one very quick short answer is Maatrixx itself said that cases, product liability cases being brought against our corporation would have a material effect upon this corporation's operations going forward, upon its financing. Where in your complaint is that alleged? That is in the third quarter Form 10-Q, and it's a specific paragraph in the complaint. Let's see. It is a specific paragraph. Well, I have it here. I'll get it when I stand up for rebuttal. Nonetheless, they did say that in a Form 10-Q. They said even one product liability suit, even one without merit, nonetheless could have an adverse effect upon the public's perception of our products and affect us going forward. Now, here's what we know that the executives at Maatrixx. Now, was the 10-Q attached as an exhibit to your complaint? I don't think it was, but I'm sure it's. This is a motion to dismiss, counsel. We're concerned with the complaint. That was my question. Where in the complaint is this fact stated so that one can infer cyander on the part of the defendants? If it's not in the complaint, why are you talking about it? That fact is in the complaint. There's a specific paragraph in the complaint. That's what I want you to give me. Yes. And as I said, when I stand up for rebuttal, I will give you the exact paragraph that talks about that 10-Q. And that 10-Q is also in the excerpts of record. I'm sure it's part of the exhibit to the defendant, Apolli's supplemental excerpts of record. Here's what the executives at Maatrixx knew. They knew starting in 1999 that Dr. Hirsch had contacted them and said that he had a cluster of patients that were taking Zycam that were reporting loss of sense of smell. He even volunteered to engage in some studies for the corporation. They denied him that. In 2002, Timothy Clarot, the vice president of research and development, and one of the defendants here reached out to a University of Colorado researcher, Dr. Miriam Linschotten, reached out to her because he said, I understand you're treating some patients for this loss of smell and they're complaining about that loss of smell being linked to our product. And I know this because one of your patients has come to the corporation and complained to us. And she said to him, well, did you know that since the 1930s, there have been all sorts of studies on the effects of zinc and the sense of smell? She sent over those abstracts to Mr. Clarot. He didn't ignore her. He didn't reject her out of hand. And he picked up the telephone and called her back and invited her to engage in some animal studies of their product. Go forward one more year, 2003, September of 2003. A trio of researchers, again from the University of Colorado, Dr. Linschotten, Dr. Jaffeck, and Dr. Morrow, are making a presentation to the American Rhinologic Society. That presentation is going to talk about 10 Zycam users using the company's product that have experienced or that are complaining of an immediate loss of a sense of smell after using that product. Matrix knows this. Matrix knows this information because Matrix fires off a letter to Dr. Jaffeck and says, you know what? As a legal matter, you do not have permission to use our name or the product's name. We would like to see your research. And after consulting ñ What's the basis of them making that claim? Why can't they use the Zycam name if they're testing Zycam? I don't know. That's a question for the Appleese, actually, why they fired off that letter saying you better ñ I mean, I think common sense is they didn't want, especially in light of what I said earlier, the knowledge inside the corporation that any bad information about their product could have a devastating effect upon their bottom line. They fired off that letter and warned him against using the product's name. Now, the district court judge thought that they were merely innocently, very benignly, just trying to protect Zycam's good name. That's what the district court said. But we know, because of what I've just told you as well as what I'm going to continue to tell you, that this was not true. They knew that they had complaints dating back to 1999. Pardon me. They knew that these three researchers from the School of Medicine at the University of Colorado were putting together this presentation. This presentation wasn't going to be on cable TV at 2 in the morning. This presentation was going to be given to the American Rhinologic Society, a society of physicians dedicated to the study of problems associated with the nasal features of humans. And I would also note that the materials that were presented to the society in redacted form, nonetheless, because apparently the doctors were afraid of legal action, but nonetheless, these materials presented to the society were later published in a peer-reviewed journal, the American Journal of Rhinology, which, again, is a fact that the district court thought was a little bit too little too late. But he had wanted to see that that study presented to the society in September of 2003 had been peer-reviewed at that moment. In other words, he was questioning the reliability, the accuracy of those doctors, of the researchers' findings at that point. But the record shows that... Were we talking about the same judge? Wasn't this Judge Murguia? I believe it was Judge Murguia. She. And I said he. I apologize to the judge in absentia. But nonetheless, those materials were published a few months after the end of the class period in a peer-reviewed journal. Now, what's also interesting is that the executives at Matrix reacted to that September 2003 presentation to the American Rhinologic Society. What happened in response to that, they convened their own panel of doctors and scientists. They admitted this in a SEC filing, that they had convened their own panel of doctors and scientists. Did you allege the FTC filing in your complaint? I'm sorry, which filing? You say there was a... The SEC filing, yes. Did you allege that in your complaint? We do. What paragraph? I'm afraid I'm going to have to get that for you on rebuttal. But we definitely do. We certainly do. And in that Form 10-K, Matrix describes a two-day meeting of the scientists. And those scientists, with all of the information available to them, with the information that one can infer that Matrix would have been putting in front of them, at that point Matrix nonetheless had to admit, quote, there is insufficient evidence at this time to determine if zinc gluconate or Zycam affects a person's ability to smell. In other words, on February 19, 2004, Matrix is admitting to the world, to its investors, we just don't know whether... No, no, no, no, no. Don't... Don't overstate it? Don't stretch that phrase. All right. What they're saying is there's insufficient evidence to come to the conclusion that zinc in their product causes anosmia or... Causes or does not cause... Not that they don't know what causes anosmia and hyponasmia. Thank you for correcting me, Your Honor. I misspoke. But let's back up two weeks. What did they say? Despite saying that, what did they say? They issued a press release in reaction to a Dow Jones news story that was, number one, talked about three lawsuits being filed against them, and number two mentioned that the FDA was starting to look into this over-the-counter homeopathic product. They issued a press release in which they specifically, quote, reaffirmed the safety of Zycam. That was the title of the press release. They said in that press release, any statements linking Zycam with loss of smell, quote, are completely unfounded and misleading, end quote. How can you say something is unfounded and misleading if you yourselves do not know whether or not what these researchers are saying about your product, what these consumer lawsuits are saying about your product? How can you just reject them out of hand like that? Well, because they're saying, we're not convinced that the allegations by these researchers are true and we believe that our product is safe because we're not convinced by what they say. Otherwise, you'd have to say, we believe this product is safe, but there are several people out there who disagree with us and their names are such and such and they say such and such. Do you think that that's necessary? Maybe something in between there. I think they have to at least do more than what they said. Let's not forget, in that same press release, they also went on to say, indeed, end quote, in no clinical trial has there been a single report of people losing sense of smell. Rather, the safety and efficacy of this product for the treatment of symptoms related to the common cold have been well established in two double-blind placebo clinical trials. As to the effectiveness of the cold remedy, they didn't say the safety of the product. They said the safety and efficacy, and I've got in here in brackets Zycam, they probably used the term zinc gluconate, which is the main ingredient in their product. They claimed at that point that the safety had been well established. That was an outright falsehood in light of what they knew going back to 1999. I've got about two minutes and 30 seconds, and I really want to bring back up those citations for you. They're paragraphs 35 and 45. Thank you. Good morning. May it please the Court. Michael Yoder. I represent the Defendant Appellee's Matrix Initiatives and the three individual defendants, Mr. Johnson, Mr. Himmelt, and Mr. Claret. I appreciate the Court giving us the opportunity to address you today. I have some comments to make and certainly would answer any questions the Court may have. Given that we're looking at a pleading and trying to test the sufficiency under the Reform Act, I think it's important to note what plaintiffs didn't allege here as to Matrix and its financial performance. No allegation that Matrix was ever required to restate earnings. No allegation that there was any accounting impropriety. No allegation even that Matrix ever missed any of its earnings estimates. Second, it's important to note what's not alleged about this product, the Zycam cold remedy. Plaintiffs don't allege that the FDA ever took any action against it. They don't allege that Zycom was ever withdrawn from the market. They don't even allege that Zycam sales ever declined. Third, I think it's important to note what's not alleged with respect to the individual defendants. But that would be that this isn't a product liability case. And it's not, Your Honor, and that's the point. It's a securities fraud case. The company and these individuals are accused of manipulating the stock price for purposes of deceiving the market with the requisite level of scienter. There's no allegation of insider trading. There's no allegation of any contemplated or pending corporate transaction. There's no allegation of overparking either. But let's not talk about that. Let me ask you, let me draw your attention to the finding of the judge below when she says the plaintiffs have failed to present evidence of a statistically significant correlation between the use of Zycam and Onmasia. Do you think that that's a proper thing, to rule on a motion to dismiss that no evidence has been presented? I think, Your Honor, that that comment has to be read in conjunction with what got the Court to that comment. So if you look at the prior page, page 11 of the Court's opinion, when it starts looking at the question of materiality, and the Court says simply, there is no data to support that claim, then you have to look at the prior page of the Court's opinion as to the reliability and accuracy of the user complaints. And then, again, before the comment that's made, the plaintiff. But are you saying that in a complaint, the defendant or, pardon me, the pleader, the plaintiff has to provide evidence? They have to allege facts, Your Honor, particularized facts. Right. Facts. Facts. And maybe evidence is the wrong word. I think so. The court should have said particularized facts. But you get to the same point. Why is statistically significant significant in this case? Isn't that just circumstantial evidence of factual knowledge? The issue is materiality. We agree with that. And the question is, what's material in a case where you don't have statements that are shown to be false? How can a judge looking at a complaint come to the conclusion that an allegation is statistically insignificant without any expert testimony as to what the statistics are? If this were a products liability case, Your Honor, I think that question would be a very difficult one to answer. This is a securities case. Well. The issue isn't simply statistical significance in isolation. As Carter Wallace and the Oron cases make clear, and all the cases that follow, the question is whether there's information that shows that future earnings are at risk of the company, that the commercial viability of the product is at risk. That's really the issue. And we live, it seems to me, in we've lived through at least 30 years in which drug companies' fortunes have risen and fallen on the basis of safety concerns and reports of injuries and bad things that have happened as a result of people taking these medications. And so I guess I'm having trouble, even if there had been only one or two or a few reported cases of people losing their sense of smell as a result of using this product, that that wouldn't have had some effect on the investors who were thinking of investing in this company. Not unless there's some indication of reliability, Your Honor. Keep in mind that if a company issues a press release or makes a public statement of complaints or some report, poster presentation that's being made, that in and of itself will have an impact on the stock price, whether it ever has anything to do with the company's future performance. That's what happened here. When the Dow Jones article came out, stock price went down immediately, even though there was never any lessening of earnings or revenue as a result of this product. Just immediately there was that effect. So you need to be concerned that you're not encouraging executives, out of fear of being sued for securities fraud, to be disclosing untested and unreliable allegations of complaints that are being made unless there's some indication of reliability, that there really is, in fact, some causal link. Is there any ñ what is the case or some authority that I could go to that would explain all of that to me? I think Carter-Wallace, Your Honor, and I think Oran. The Second Circuit case in Carter-Wallace and the Third Circuit case in Oran. And I think Carter-Wallace, too, is important. But is there anything from the SEC that is helpful? Well, on the issue of litigation, yes. There's the regulation that talks about when litigation has to be disclosed. Yeah, I understand all that. It has to be material, 10 percent of what not. I'm just wondering if the SEC has done anything. We have a long history of that. Nothing that I'm aware of, Your Honor, on this particular issue. Nothing on this issue. But plaintiffs recognize that the user complaints alone aren't enough. If you look at the complaint, they allege in paragraph 33 and 34 the essence of what they really have to plead to get past this requirement, that this information when disclosed would adversely affect the company's business. There are no particularized allegations to show that's true, to show that the disclosure of this information had anything to do with the company's business, had anything to do with the sale of Zycon, had anything to do with the acceptance of this product in the market. And the reason there's no allegations is that they can't do that truthfully because they know it's not true. So the absence of those allegations, I submit, Your Honors, is very significant. They can't allege these facts because they're not true. This product is still on the market and it's still doing quite well. Carter Wallace, too, is instructed because there what happened is after there were reports of death, the FDA and the company decided to withdraw the product from the market. And at that point in time, the Court said that's significant, that has to be disclosed. That never happened here. This product was never withdrawn. The FDA never took any action. So the point is executives of a company shouldn't be required, there's no duty to disclose unreliable, untested information, which if disclosed prematurely in and of itself could have a detrimental impact on the product and on the company's stock price without having more. And here in this complaint, there is no more. Tell me why your company told Dr. Safik that they would come down on him like a ton of bricks if he used the word, the name Ziacom. Why couldn't he do that? They didn't say they would come down on him like a ton of bricks, Your Honor. I think that in this case, the Court is able to and should, I would submit, look at the actual letter that's written. It's in the supplemental excerpts of record. It's supplemental excerpt 74. It's attached to Ms. Longo's declaration. And it was submitted to the district court because the plaintiffs referenced it in the complaint and made allegations as to what the letter said. And if one reads the letter, what it says is we've learned that you're planning a presentation. We believe that this product is safe. We're very interested in learning more about your adverse reports included in your presentation. And to the extent you have valid clinical data supporting your conclusions, we would appreciate receiving that immediately. They're trying to get information from Dr. Safik. What did they say about using the name Ziacom? At the very end of the letter, after asking for information, they say, additionally we point out that as a legal matter, you do not have our permission to use our company name or product trademarks. That's the statement in the letter. What's the basis of that claim? Why can't they use Ziacom as a legal matter? They're not trying to sell anything using the name Ziacom. They're saying Ziacom doesn't work and hurts people. Their concern, Your Honor, is that they had no information as to what Dr. Jaffer got. You're not answering that question. My question is what's the legal basis upon which they say as a legal matter, you cannot use the name Ziacom. What's the basis of that? The only thing mentioned in the letter, Your Honor, is not using their trademark. Are they using a trademark when they do ten clinical studies? Are they selling anything? I don't know what Dr. Jaffer was doing. So your answer, I think, candidly would be you have no idea what the legal basis was for that claim. The legal basis was that Ziacom is a trademark of the company. My question to you is, do you conceive of the use that Dr. Sifek was using in Colorado, a use of the trademark? Were they selling Ziacom to anybody? I don't know that the issue ever got flushed out that way, Your Honor. So I don't know that I can answer that. I think your answer is I don't know, right? I certainly don't know what Dr. Jaffer was intending, and it's not alleged in the complaint. What is important, though, is the company's actions here don't show an intent to deceive They don't show reckless deliberateness. What they show is a company that was trying to get information throughout this class period of time to determine if there were any substance to these complaints that were surfacing. I think it's important to keep in mind the chronology. The first complaint is alleged to have occurred in 1999, when the company first started selling the Ziacom cold remedy. The next alleged fact is 2002, almost three years later, when another user complaint, three years after the product had been on the market, was surfaced. And there it's the company reaching out to a doctor who had a patient who reported some symptom to get information, and then asking that doctor if that doctor, Dr. Linschot, would be interested in participating in studies, which she declined to do. It was another full year before there were any additional user complaints that came in. This as a result of the poster presentation that was being planned by Dr. Jaffick. There again, the company reached out to try to get information from Dr. Jaffick to try to understand the basis of the presentation that he was making. I think that Carter, Carter Wallace, too, put it well. There the court found no see-enter until the product was withdrawn from the market. And I'm quoting. Here, the early medical reports may have indicated a potential problem, but until a connection between Febitol and any illness could be made, we would not expect Carter Wallace to abandon its product on what, at that time, would have been speculation. The complaint here cannot support an inference that Carter Wallace turned a blind eye to the reports of adverse side effects. I would also point the court in to the supplemental excerpts of record 74, tab 11, which is the 8K that was filed in late February after the class period regarding the panel of scientists that was convened by, by Matrix. Again, trying to understand if these complaints had some significance, if there was some reliability, they convene a panel of scientists who take a look at the available scientific evidence at that point, and what they say in the 8K, after noting other information suggesting that the incidence of anosmia in the general population is 1 to 2 percent as it is, they opine that, in their opinion, there is insufficient scientific evidence at this time to determine if zinc gluconate, when used as recommended, affects a person's ability to smell. That is not demonstrating the falsity of the statements that were made in the press release. One has to twist, as counsel did, what was said in this 8K, and twist what was said in the press release that was issued on February 2nd, which, by the way, is just four days before the end of the class period. There, what the company said, and the press release is also part of Supplemental Excerpt of Record 74. It's tab 8. First, as Judge Bea noted, that Matrix believes that the statements that were made about the products causing anosmia are unfounded and misleading, stating the company's belief, no allegation that it didn't genuinely believe that, then and now. And number two, that in no clinical trial has there been a single report of lost or diminished olfactory function. Again, there's no allegation that that was a false statement, then or now. Finally, or another point with respect to litigation, because I know I'm nearing the end of my time, the disclosure that was made in the 10Q in November didn't say litigation would be material. It said it could be, depending on the circumstances. And there's no allegations here that any of the lawsuits were. Let me just sum up by saying this. These defendants had to make a business judgment whether to disclose these reports. They had to do it knowing if they did, it could have an effect on the product and the stock. They made a good faith decision it didn't. If they could be exposed to security fraud on these limited facts, executives in making that decision are going to be more fearful that they could be sued for securities fraud than making the right choice about what to disclose and when. Thank you very much. Thank you. Three very quick points on rebuttal, Your Honors. The first two are very, very quick. Number one, counsel says there's been no FDA action on Zycan. Big deal. There's been no FDA action on Vioxx either before it caused some estimated 30 to 70,000 deaths and it was voluntarily withdrawn from the market. Number two, counsel said, well, you know, the stock price dropped a little bit when that Dow Jones story came out and that's the kind of thing that happens here with these lawsuits. People file a lawsuit at the drop of a hat. Well, the stock then came back up because of that February 2, 2004, rebuttal by Matrix and then what happened? It plummeted 24 percent four days later when investors found out for the first time because of that Good Morning America expose, A, that these lawsuits actually were real and there were more coming down the pike, and two, that Dr. Jafick out of the University of Colorado had a group of 10 people that were claiming that they had suffered from this terrible side effect. Number three, again, thank you, Judge Tashima, for pointing me to the correct paragraphs. I would like the court to look at paragraph 35 in the complaint and that is the 10Q where Matrix executives do admit to investors just how important it is the safety of their products, the perception of the safety of their products is the investing public. We are subject to significant liability should use or consumption of our products cause injury, illness, or death. Injury, just an injury, a product liability claim, even one without merit or for which we have substantial coverage could result in significant legal defense costs. Such a claim, whether or not proven to be valid, could have a material adverse effect on our product branding and goodwill resulting in reduced market acceptance of our products. They made that statement in that SEC filing knowing very well that the Christiansen lawsuit over in Michigan with two plaintiffs had already been filed and they omitted that fact from that 10Q. They knew at that point that Dr. Jafick and his two colleagues had already made a and they omitted it. And I suggest to you that those two series of facts are irreconcilable. I'm going to step down now before my time is completely out. I've never done that. I'd like to do it just once. Thank you. Thank you. Appreciate it. The case just argued is submitted for decision.
judges: Schroeder, Tashima, Bea